**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| RODNEY BROWN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:18-cv-00389-MTS |
| ) | |
| CITY OF ST. LOUIS, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

A video in the record of this case unequivocally shows Plaintiff, Rodney Brown, disrupting a ticketed event on private property, screaming in the faces of other attendees, resisting his removal by police officers, and yelling expletives at the crowd as the officers escort him out of the event. Despite his disruptive and belligerent behavior being captured on video, he brought a slew of claims against a host of Defendants, including President Trump, whose campaign event it was, the City of St. Louis, which employed the officers who arrested him, and multiple police officers individually. Many of these claims were dismissed. The remaining Defendants now have moved for summary judgment on the unresolved claims. The video, along with other undisputed facts from the record, plainly show probable cause existed to arrest and prosecute Plaintiff. As explained below, his claims fail, and the Court therefore will grant the Motion for Summary Judgment, Doc. [108].

**I.   Background**

On March 11, 2016, former President Donald Trump, then a candidate for the 2016 presidential election, held a sizable, ticketed campaign rally inside the privately-owned Peabody Opera House in St. Louis. Multiple attendees disrupted the rally in protest during various times

throughout the event. *See* Doc. [128] ¶ 11.  Plaintiff, Rodney Brown, was one of them.  Plaintiff Brown acquired a ticket and took a seat in the first row open to the public, "very close to the front of the auditorium," and just a few seats over from the center aisle.  Doc. [120] ¶ 4.  A video in the record "accurately depicts"[1] much of the events at issue here.  *Id.* ¶ 5.  Several minutes into Trump's remarks, during an otherwise quiet moment after Trump momentarily paused, Plaintiff made an exceedingly loud, prolonged, and forced laughing sound.  His laugh was so loud that though the video in the record was recorded near the back of the crowded auditorium, a considerable distance from Plaintiff at the front of the auditorium, Plaintiff's laughing sound is clearly audible.  Of the large crowd, only Plaintiff's laughing sound is heard.  That is, no one else in the audience can be heard reacting audibly to Trump's statement at all, let alone with laughter.

Even when viewing the facts in the light most favorable to Plaintiff, it is still fair to say that his laughing sound was out of place.  *See* Doc. [109-3] at 10 (34:3-15) (Plaintiff noting that Trump "just kinda cracked [him] up" because Trump's "jokes" were "not, like, landing").  In any event, Trump and the crowd did not receive the laugh well.  After Plaintiff laughed, the video shows that Trump immediately shielded his eyes from the stage lights so that he could look into the audience.  The crowd simultaneously began to stir.  Row after row of people visible in the video, almost all of whom had been sitting when Plaintiff made his loud laughing sound, began to stand up.  Soon, nearly everyone visible in the audience—dozens of individuals—were standing.  The crowd's murmuring swiftly turned boisterous.  Multiple audience members can be heard yelling "get him out of here," or some variation of it.

---

[1] Doc. [120] ¶ 5 (Plaintiff noting it is "[u]ncontested that Exhibit A accurately depicts a portion of events that occurred at the Trump Rally."); Doc. [109-3] at 9 (32:10-13) (Plaintiff agreeing at his deposition that the video "accurately and fairly depicts events that occurred at the Donald Trump rally on March 11, 2016.").

No less than three men can be seen approaching Plaintiff, who was also on his feet. Plaintiff "feared that the three men who approached him might physically harm him." Doc. [120] ¶ 10.  A man seated next to Plaintiff, Mark Comfort, observed one of the men approaching Plaintiff. *Id.* ¶ 11.  Comfort also "fear[ed]" the man "might resort to violence." *Id.*  Comfort attempted to keep Plaintiff and the man separate and urged the man not to "do anything violent." *Id.*  Plaintiff had a different approach.  The video shows Plaintiff "nose-to-nose"[2] with the man, as Comfort put it, and screaming in the man's face. *Id.* ¶ 12.  That is to say, Plaintiff yelled in the face of someone he thought might become violent.  The video plainly shows Plaintiff alternate between animatedly yelling in the man's face and yelling and pointing in the direction of Trump on stage.  As Plaintiff and the man exchange words, the video shows the man repeatedly pointing toward the back of the auditorium.  From the stage, Trump instructs that Plaintiff be removed, six times saying some variation of "get him out of here." *See* Doc. [109-3] at 26 (98:8-12) (Q: "Was it your impression when Trump said that, that he was talking about you, 'Get him out of here'?" A: "Yes.  Yes, I was the only person he was directing that toward[.]").

Defendants Matthew Boettigheimer and Steven Korte were present at the rally as on-duty St. Louis Metropolitan Police Department officers.  Defendant Boettigheimer heard Plaintiff's "very loud out-of-place laugh" that started the ruckus, a laugh "he believed was made to intentionally disrupt the event." Doc. [120] ¶ 16.  Boettigheimer saw Plaintiff "engaged in [the] disturbance" with other audience members. *Id.* ¶ 17.  Boettigheimer felt the disturbance "was

---

[2] Comfort testified that Plaintiff and the other man were "nose-to-nose." Doc. [109-7] at 9 (31:14-20).  Plaintiff, though, attempts to characterize that as a genuine dispute of fact because Plaintiff testified only that he was "within one foot from" the man and that "he did not testify they were 'nose-to-nose.'" Doc. [120] ¶ 12.  That Plaintiff did not testify that he *was* nose-to-nose with the man does not create a dispute.  Plaintiff does not point the Court to anywhere that he, under oath, denied being nose-to-nose.  Only that he did not describe it that way.  Plaintiff's testimony, that he was within one foot of the man, is consistent with Comfort's testimony in that a person nose-to-nose with someone can easily be said to be within one foot from the other.  Plaintiff pointed to no information in the record that contradicted Comfort's description of nose-to-nose, and it therefore is not disputed.

3

getting too large" and that he "needed to quell it immediately" in order to prevent it from becoming violent. *Id.* ¶ 21. So, with the assistance of Defendant Korte, Boettigheimer "escorted [Plaintiff] out of the auditorium." *Id.* ¶ 22. It took some time for them to escort Plaintiff to the back and out of the auditorium since Plaintiff chose to sit so close to the front. But Plaintiff took advantage of this long escort down the center aisle. He "continued to turn around and yell" in the direction of Trump and the crowd. *Id.* ¶ 23.

As Defendants got closer to the exit with Plaintiff, the video shows Defendants Korte and Boettigheimer slowing down as they ask the throngs of media and spectators blocking the aisle to clear. Plaintiff, with his head still turned away from the exit, continued yelling at the crowd and at Trump. At that point, both Boettigheimer and Korte had a hold of Plaintiff and were trying to move him forward. Plaintiff, though, was completely turned and facing the opposite way—still facing toward Trump and the crowd. He continued his recalcitrance as they neared the exit, turning toward the crowd, yelling fervently, and gesturing with a free arm. From the roar of the crowd, his words cannot be heard on the recording. But his fervent yelling led to clear articulation that makes what he was saying unmistakably clear: "fuck you!" and "fuck" this and that. The camera then pans away, capturing the face of one onlooker, mouth agape.

Once out of the auditorium, Defendant Korte and Boettigheimer took Plaintiff to a hallway, and Defendant Boettigheimer "placed [Plaintiff] under arrest." Doc. [120] ¶ 25. An officer then transported Plaintiff to the Central Patrol Division, where he was held for "about an hour" before officers released him. *Id.* ¶ 28. Defendant Joseph Steiger prepared an incident report documenting Plaintiff's arrest as well as those of other protestors arrested that day. *Id.* ¶ 32. On April 6, 2016, the City of St. Louis filed formal charges against Plaintiff for peace disturbance under Section 15.46.030 of the St. Louis City Municipal Ordinance Code. *Id.* ¶ 25; Doc. [123] at 5. A judge

4

acquitted Plaintiff of the charge on September 18, 2017 but also noted in the acquittal that "Officer Boettigheimer's decision to remove [Plaintiff] was proper and reasonable." Docs. [94] ¶ 41; [1-4] at 5.

Plaintiff evidently disagreed on that point and subsequently filed this action alleging multiple counts based on federal and state law for his removal from the rally and his arrest and prosecution. He alleged claims against Trump, several individual police officers, and the City of St. Louis under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). After multiple dismissals, a total of three Defendants and five counts remain. *See, e.g.*, Docs. [55], [106], [119]. Count I alleges an unlawful seizure pursuant to 42 U.S.C. § 1983 against Defendants Boettigheimer and Korte. Count II alleges malicious prosecution pursuant to § 1983 against Defendants Boettigheimer, Korte, and Steiger. Count III alleges retaliation for exercise of First Amendment rights pursuant to § 1983 against Boettigheimer and Korte. Count V alleges false arrest under Missouri law against Boettigheimer and Korte. And Count VI alleges malicious prosecution under Missouri law against Boettigheimer, Korte, and Steiger. All three Defendants have moved for summary judgment on all counts against them.

## II. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment to a moving party "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party, but only if there is a "genuine" dispute as to those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Mere "metaphysical doubt as to the material facts" is insufficient to defeat summary judgment. *Id.* A

5

party asserting that a fact is genuinely disputed must support the assertion by citing to particular parts of materials in the record. Fed. R. Civ. P. 56(c).

Courts must not weigh evidence at the summary judgment stage but instead should decide whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott*, 550 U.S. at 380. Thus, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on [the] motion." *Id.*

Accurate videos of events in question can allow a court to determine what happened without weighing evidence. *White v. Jackson*, 865 F.3d 1064, 1077 (8th Cir. 2017) (noting that given "video and audio evidence" in the case, the court "need not accept [a party's] version of the facts"); *see also Coker v. Ark. State Police*, 734 F.3d 838, 843 (8th Cir. 2013) (reversing a grant of summary judgment because "[w]ithout the aid of video or an understandable audio recording, it is impossible to determine what happened . . . without weighing [the officer's] version of [the facts] against [the plaintiff's] story"); *Michael v. Trevena*, 899 F.3d 528, 533–34 (8th Cir. 2018) (finding a genuinely disputed material fact precluded summary judgment on an unlawful arrest claim because the recordings were inconclusive and a jury could reasonably adopt either the officers' or the plaintiff's version of the facts).

III. **Discussion**

    A. *Undisputed Material Facts Show That Probable Cause Existed to Arrest and Prosecute Plaintiff*

Because probable cause existed to arrest and prosecute Plaintiff, all his claims fail. "Whether probable cause exists is a question of law to be determined at the moment the arrest is made, and any later developed facts are irrelevant to the analysis." *Nader v. City of Papillion*, 917 F.3d 1055, 1058 (8th Cir.) (cleaned up), *reh'g denied* (Apr. 15, 2019), *cert. denied*, 140 S. Ct. 45 (2019); *accord Gibson v. Cook*, 764 F.3d 810, 813 (8th Cir. 2014) ("Whether a warrantless arrest was supported by probable cause is a question of law for a court to decide.") (internal quotations omitted). An officer has probable cause to arrest "when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Nader*, 917 F.3d at 1058. This standard "inherently allows room for reasonable mistakes by a reasonable person." *Ulrich v. Pope Cty.*, 715 F.3d 1054, 1059 (8th Cir. 2013).

Defendants arrested Plaintiff for a violation of a St. Louis City Ordinance prohibiting disturbing the peace, section 15.46.030. That section provides, in part, that a person who "disturb[s] the peace of others by noisy, riotous or disorderly conduct, or by violent, tumultuous, offensive or obstreperous conduct or carriage, or by loud and unusual noises, or by unseemly, profane, obscene, indecent, lewd or offensive language, calculated to provoke a breach of the peace" is guilty of a misdemeanor. The Supreme Court of Missouri has narrowed the application of the ordinance "to acts or conduct inciting violence or intended to provoke others to violence." *City of St. Louis v. Tinker*, 542 S.W.2d 512, 516 (Mo. banc 1976); *see also Green v. Missouri*, 734 F. Supp. 2d 814, 835 (E.D. Mo. 2010) (discussing *Tinker*). Thus, for there to have been probable cause to arrest Plaintiff for violating the ordinance, the totality of the circumstances at the time of his arrest must have been sufficient to lead a reasonable person to believe that Plaintiff had or was engaged in acts or conduct inciting violence or intended to provoke others to violence.

7

As the fact section set out in detail, the totality of the circumstances in this matter is sufficient to lead a reasonable person to believe that Plaintiff did engage in acts or conduct inciting violence or intended to provoke others to violence. The video plainly demonstrates it. Plaintiff chose to go to a rally for a political candidate he did not support. *See* Doc. [109-3] at 5 (17:6-8). He did so while also believing that Trump's rallies had a history of violence toward those who interrupted them or voiced their disapproval. On "more than one occasion," he alleged, "Trump supporters" acted violently toward "dissenters at Trump rallies or campaign appearances." Doc. [94] ¶ 13. He also alleged Trump supporters "assaulted" "protesters" at events in Louisville, Kentucky and Fayetteville, North Carolina just days before the rally in St. Louis that he attended. Doc. [94] ¶ 18–19. He testified in his deposition that he had these opinions and knew about incidents at previous Trump events prior to attending the event in question. He "had observed that violent interactions were taking place at other Trump events," and he "believe[d] that Trump supporters" had "a proclivity for violence." Doc. [109-3] at 18 (69:15-20).

With this impression, he acquired a ticket to the rally. While tickets were required for admission, seats were not assigned. Doc. [109-3] at 7 (24:24-25:4). He went out of his way to secure a front and center seat. He testified that he asked for and received permission from an officer to get in front of "thousands" of people in the admission line. Doc. [109-3] at 6–7 (20:5-25:4). While some in the line told Plaintiff they had been waiting there since 3:00 a.m., see *id.*, he arrived within ten or fifteen minutes prior to the start of admission, *id.* at 5 (17:17-23). Then, once inside and in a prime spot, and despite believing that Trump supporters had a proclivity for violence, he made a loud, out-of-place laughing sound that could be heard all the way in the back of the crowded auditorium and that by his own explanation was derisive. *See* Doc. [109-3] at 10

8

(34:3-15) (Plaintiff noting that Trump "just kinda cracked [him] up" because Trump's "jokes" were "not, like, landing"). His loud laughing sound disrupted the event and caused a swift reaction.

But Plaintiff's disruption did not end with his forced laugh. Far from it. After his laughing sound did not sit well with Trump and the audience, the video shows Plaintiff was standing up and yelling. Indeed, the video shows Plaintiff nose-to-nose with one man. Plaintiff then alternated between yelling in the man's face and turning to yell toward the direction of Trump. Plaintiff yelled in the faces of those he believed had a proclivity for violence. But Plaintiff still was not finished. When Defendants Boettigheimer and Korte arrived at Plaintiff's row to remove him from the auditorium, Plaintiff did not go amicably. He took full advantage of the long escorted walk from his seat in the front of the auditorium to an exit in the back, yelling all the way and constantly turning his head to continue to engage. As officers neared the exit with him, his outburst reached its crescendo. Plaintiff was fully turned, facing Trump and facing away from the exit. He was belligerent. Defendants Boettigheimer and Korte continue trying to remove him from the auditorium, but Plaintiff continues to yell. What he is yelling cannot be made out audibly. But—from watching the video—the articulation of his lips shows his unmistakable words: "fuck Trump" and "fuck" this and that.

Under the totality of the circumstances at the time of his arrest, it was sufficient to lead a reasonable person to believe that Plaintiff had engaged in—and was engaged in—acts or conduct inciting violence or intended to provoke others to violence. As such, probable cause existed to arrest Plaintiff.

B. *Count I, Unlawful Seizure*

Plaintiff alleges in Count I that Defendants Boettigheimer and Korte "deprived [him] of his right to be free from unreasonable seizures of his person." Doc. [94] ¶ 53. The Fourth

9

Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." An arrest "supported by probable cause" does not violate the Fourth Amendment. *White*, 865 F.3d at 1074. Because the Court has concluded that probable cause[3] supported Plaintiff's arrest, his claim in Count I fails.

Even if there were not probable cause to arrest Plaintiff for violating the peace disturbance ordinance, Defendants are entitled to qualified immunity "if there [wa]s at least 'arguable probable cause.'" *White*, 865 F.3d at 1074 (quoting *Borgman v. Kedley*, 646 F.3d 518, 522–23 (8th Cir. 2011)). "Arguable probable cause exists even when an officer mistakenly arrests a suspect believing the arrest is based in probable cause if the mistake is objectively reasonable." *Nader*, 917 F.3d at 1058. While the probable cause standard itself "inherently allows room for reasonable mistakes by a reasonable person," the arguable probable cause standard "affords law enforcement officials an even wider berth for mistaken judgments 'by protecting all but the plainly incompetent or those who knowingly violate the law.'" *Ulrich*, 715 F.3d at 1059 (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)). Arguable probable cause in this case is easily met. *See Jeremy Rothe-Kushel v. Jewish Cmty. Found. of Greater Kansas City*, 4:18-cv-319-BP, 2020 WL 9751592 (W.D. Mo. Jan. 30, 2020), *aff'd*, No. 20-1418, 2021 WL 2104873 (8th Cir. May 25, 2021) (per curiam) (affirming district court's conclusion that at least arguable probable cause supported the removal and arrest of audience member who began arguing with speaker at question-and-answer session during event held at public library).

C.  *Count II, Malicious Prosecution*

---

[3] While the Court concludes probable cause existed for Plaintiff's arrested offense, his arrest would be lawful if probable cause existed that he committed or was committing *any* offense for which Defendants were aware of the underlying conduct. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (noting an arresting officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause"); *United States v. Demilia*, 771 F.3d 1051, 1054 (8th Cir. 2014) ("[P]robable cause for the arrest still exists as long as the facts known to the officer would provide probable cause to arrest for the violation of some other law."); *Green*, 734 F. Supp. 2d at 836–37. *See, e.g.*, Mo. Rev. Stat. §§ 565.056, 569.140, 574.020, 575.150.

Count II of Plaintiff's Amended Complaint purports to advance a "malicious prosecution" claim "pursuant to 42 U.S.C. § 1983." Section 1983 "only provides a remedy for violations of rights expressly secured by federal statutes or the Constitution." *Kurtz v. City of Shrewsbury*, 245 F.3d 753, 758 (8th Cir. 2001). "The Constitution does not mention malicious prosecution," and the Eighth Circuit "has uniformly held that malicious prosecution by itself is not punishable under § 1983 because it does not allege a constitutional injury." *Id.* (citing *Gunderson v. Schlueter*, 904 F.2d 407, 409 (8th Cir. 1990)). "Thus, [Plaintiff's] allegation of malicious prosecution cannot sustain a civil rights claim under § 1983." *Kurtz*, 245 F.3d at 758; *accord Tech. Ordnance, Inc. v. United States*, 244 F.3d 641, 650 (8th Cir. 2001) ("The general rule is that an action for malicious prosecution does not state a claim of constitutional injury."). Regardless, the presence of probable cause in this case to prosecute Plaintiff would defeat the claim. *Joseph v. Allen*, 712 F.3d 1222, 1228 (8th Cir. 2013) (noting that even if *Kurtz* did not preclude a malicious prosecution claim, the existence of probable cause to initiate a criminal prosecution would merit summary judgment for officers on such a claim).

D. *Count III, Retaliation*

In Count III, Plaintiff alleges that Defendants arrested him "[a]s a result of" and "in retaliation for" the exercise of "his right to free speech and assembly." Doc. [94] ¶¶ 69–70. Generally, "probable cause or arguable probable cause is fatal to a First Amendment retaliation claim." *Garcia v. City of New Hope*, 984 F.3d 655, 670 (8th Cir. 2021) (citing *Galarnyk v. Fraser*, 687 F.3d 1070, 1076 (8th Cir. 2012)). Although probable cause generally defeats a retaliatory arrest claim, a narrow qualification exists for circumstances where officers have probable cause to make arrests, but rarely exercise their discretion to do so. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019). For example, if jaywalking occurs all the time at a particular intersection, and the police

11

rarely, if ever, arrest jaywalkers but do arrest a jaywalker who just has been protesting police conduct, a retaliation claim is viable despite the presence of probable cause for arrest.

But nothing in the record shows this "narrow qualification" applies here.[4] Plaintiff did not present what *Nieves* called the "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* In fact, Plaintiff did not even argue the *Nieves* exception applied here; he argued only that no probable cause existed to arrest him. Doc. [123] at 12–13. The Court has concluded otherwise. With probable cause—or at least arguable probable cause—supporting his arrest, Plaintiff's First Amendment retaliation claim fails.

E. *Count V, False Arrest*

In Count V, Plaintiff alleges a claim of false arrest under Missouri law. To succeed on a claim for false arrest under Missouri law, a plaintiff must plead and prove two elements: (1) restraint of the plaintiff against his will and (2) the unlawfulness of that restraint. *Blue v. Harrah's N. Kansas City, LLC*, 170 S.W.3d 466, 472 (Mo. Ct. App. 2005) (citing *Bramon v. U-Haul, Inc.*, 945 S.W.2d 676, 680 (Mo. Ct. App. 1997)). Given the Court's conclusion that probable cause existed to arrest Plaintiff, his restraint was lawful, and his claim for false arrest under Missouri law necessarily fails. *See Blue*, 170 S.W.3d at 479; *see also Edwards v. McNeill*, 894 S.W.2d 678, 683 (Mo. Ct. App. 1995); *Joseph*, 712 F.3d at 1228.

F. *Count VI, Malicious Prosecution*

---

[4] Even if the narrow qualification applied here, Defendants would be entitled to qualified immunity. Qualified immunity "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). It was not clearly established at the time of Plaintiff's arrest that an arrest supported by probable cause, but which is in retaliation for speech, violated the First Amendment. *See Nieves*, 139 S. Ct. at 1721 (noting the 2019 case presented to the Supreme Court the question of "whether probable cause to make an arrest defeats a claim that the arrest was in retaliation for speech protected by the First Amendment").

12

Plaintiff's last count, Count VI, alleges a claim of malicious prosecution under Missouri law. To succeed on a claim for malicious prosecution under Missouri law, a "plaintiff must plead and prove six elements: (1) commencement of an earlier suit against plaintiff; (2) instigation of the suit by defendant; (3) termination of the suit in plaintiff's favor; (4) lack of probable cause for the suit; (5) malice by defendant in instituting the suit; and (6) damage to plaintiff resulting from the suit." *Edwards v. Gerstein*, 237 S.W.3d 580, 582 (Mo. banc 2007). Missouri law does not "favor[]" malicious prosecution actions since "public policy supports uncovering and prosecuting crime." *Sanders v. Daniel Int'l Corp.*, 682 S.W.2d 803, 806 (Mo. banc 1984). As such, courts require strict compliance with the requisite elements. *Copeland v. Wicks*, 468 S.W.3d 886, 889 (Mo. banc 2015) (citing *Edwards*, 237 S.W.3d at 583).

As the Court previously concluded, probable cause existed to support Plaintiff's arrest, and the Court concludes that probable cause supported his prosecution, too. As he did on the unlawful seizure claim, Plaintiff focuses exclusively on his loud, out-of-place laughing sound. But the video clearly shows his derisive and disrupting laugh was just his first foray into disturbing the peace that day (*i.e.*, provoking others to violence or intending to provoke others to violence). The video shows Plaintiff screaming in the face of another attendee. And not just any attendee but an attendee that Plaintiff has sworn he feared may physically harm him (*i.e.*, become violent). Plaintiff's screaming in the face of someone he feared may become violent leads this Court to the inescapable conclusion that Plaintiff intended to provoke violence. Not to mention his screaming all the way down the aisle as police escorted him out. There was sufficient probable cause to prosecute Plaintiff for the offense. *See Crow v. Crawford & Co.*, 259 S.W.3d 104, 115 (Mo. Ct. App. 2008) ("Where a *prima facie* showing of probable cause exists, the fact that the plaintiff was acquitted does not, without more, create a genuine issue of fact on that issue.").

13

CONCLUSION

Plaintiff failed to demonstrate that Defendants violated any of his constitutional rights when they arrested and prosecuted him after he interrupted a private political event, engaged in a heated argument with another attendee, and screamed at the speaker and crowd on his way out of the event, leaving, only recalcitrantly, once physically escorted out of the auditorium.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment, Doc. [108], is **GRANTED**.

An appropriate Judgment will accompany this Memorandum and Order.

Dated this 14th day of June, 2021.

                                                MATTHEW T. SCHELP
                                                UNITED STATES DISTRICT JUDGE